IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL M. McGINLEY,

                    Plaintiff,                                     CV 08-6219-ST

       v.

                                                     OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                                Defendant.

STEWART, Magistrate Judge:

       Plaintiff, Paul McGinley, challenges the Commissioner's decision denying his

application for supplemental security income ("SSI") payments under Title XVI of the Social

Security Act. The court has jurisdiction under 42 USC §§ 405(g) and 1383(c). The parties

consent to the jurisdiction of the Magistrate Judge to enter a final order and judgment in

accordance with FRCP 73 and 28 USC § 636(c). For the reasons set forth below, the

Commissioner's decision is affirmed.

## PRIOR PROCEEDINGS

McGinley applied for SSI on April 2, 2002, alleging disability as of January 1, 2001, due to mental depression and back problems. Tr. 91-93.[1]  After his application was denied initially and on reconsideration, he requested a hearing. Tr. 40.  A hearing was held before Administrative Law Judge ("ALJ") Jean Kingery on February 16, 2005. Tr. 282-337.  The ALJ issued a decision on May 24, 2005, finding that McGinley was not disabled. Tr. 358-69. McGinley requested review of that decision which the Appeals Council denied. Tr. 6-9.

McGinley then filed a complaint in this court. Tr. 341, 373.  Based on the stipulation of the parties, this court issued an Order dated September 28, 2006, reversing and remanding the ALJ's decision for further proceedings. Tr. 373-74.  Hearings on remand were held before ALJ Kingery on October 20 and November 27, 2007. Tr. 652-72, 673-85.  The ALJ issued a decision on March 26, 2008, again finding McGinley not disabled. Tr. 338-50.  When the Appeals Council did not review the case, the ALJ's decision became the final decision of the Commissioner. 29 CFR § 404.984.  McGinley now seeks judicial review of the ALJ's March 26, 2008 decision.

## ALJ'S FINDINGS

The ALJ applied the five-step sequential disability determination process set forth in 20 CFR § 416.920. *Bowen v. Yuckert*, 482 US 137, 140 (1987).  The ALJ found that McGinley was disabled by mental disorders associated with drug and alcohol abuse. Tr. 344-47.  However, factoring out the effects of drug and alcohol abuse, the ALJ found that McGinley retained the residual functional capacity ("RFC") to perform work in the national economy. Tr. 347-49.  In

---

[1]  References to "Tr." are to the Transcript of the Administrative Record filed on November 26, 2008 (docket #11).

reaching this conclusion, the ALJ considered newer medical records which did not change her

initial findings from 2005.  Tr. 348.

## STANDARD OF REVIEW

District courts have the power to affirm, modify, or reverse the decision of the

Commissioner, with or without remanding the case.  42 USC § 405(g).  The Commissioner's

decision must be affirmed if it is based on proper legal standards and the findings are supported

by substantial evidence in the record as a whole.  42 USC § 405(g); *see also Andrews v. Shalala*,

53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but

less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Andrews*, 53 F3d at 1039.  The court must weigh all of

the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v.

Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted).  The Commissioner's decision must

be upheld, however, even if "the evidence is susceptible to more than one rational

interpretation."  *Andrews*, 53 F3d at 1039-40.

## DISCUSSION

McGinley contends the ALJ erred in evaluating the evidence of his RFC and improperly

elicited testimony from the vocational expert ("VE") with assumptions that did not accurately

reflect his functional limitations.

## I.    RFC Assessment

The RFC assessment describes the work-related activities a claimant can still do on a

sustained, regular, and continuing basis, despite the functional limitations imposed by his

impairments.  20 CFR § 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184.

An ALJ must consider all the evidence of limitations and restrictions in assessing a claimant's RFC. SSR 96-8p, 1996 WL 374184 * 5.

In her 2005 decision, the ALJ found that McGinley impeded the accurate evaluation of his RFC by providing inconsistent statements to various sources in the record regarding his education, work history, substance abuse history, and symptoms. Tr. 364-66. In particular, the ALJ determined that McGinley's subjective statements were not credible. *Id*. The ALJ incorporated this same credibility finding in her 2008 decision after remand. *Id* at 348. McGinley does not challenge that finding, but instead contends the ALJ did not properly consider the reports of four mental health professionals and improperly discredited his mother's statements.

### A.    Mental Health Treatment

According to his SSI application, McGinley stopped working in 1996 due to severe depression and schizophrenia. Tr. 100. However, the record reveals that he did not seek mental health treatment until August 2001 when he was referred to Benton County Mental Health Services by the state disability services agency based on his disability claim and by his probation officer to complete mandatory drug treatment. Tr. 199-201. He was on probation for theft, possession of methamphetamine, and menacing. *Id* at 199. He reported a history of methamphetamine abuse prior to December 1999 and also stopped drinking alcohol at that time, although he had never been a heavy drinker. *Id*. McGinley stated that he had completed eight years of school and obtained a GED. *Id*. He reported that he stopped working in 1996 due to back problems. *Id*. He did not indicate deficits in activities of daily living, but could not continue his past hobbies because of back problems. *Id* at 200. His mental status examination

was benign. *Id*. He did not exhibit intellectual or memory deficits and "seemed to have good capacity for abstract thinking and problem solving," but reported "trouble with appetite and sleep secondary to his depression." *Id*. McGinley failed to attend appointments after this intake interview and was discharged from treatment. *Id* at 198.

In April 2002, Jon Sobotka, MD, was asked to see McGinley at the Benton County Correctional Facility because McGinley threatened suicide when he learned he was to be transferred to the Lincoln County Jail. *Id* at 647. This was a brief visit in a holding cell because McGinley was "on his way out the door." *Id* at 280. McGinley denied drug use for two years, but admitted recent alcohol use. *Id* at 646. He made vague and inconsistent references to hearing voices, but did not have any genuine psychotic symptoms. *Id*. He was vague about his depressive symptoms, did not appear to be in acute distress, and exhibited behavior "not consistent with severe mental illness." *Id* at 280, 646-47.

In August 2002, after McGinley was arrested for violating release conditions after an incident of alcohol intoxication, Dr. Sobotka visited him for the second time at the Benton County Correctional Facility. *Id* at 644-45. McGinley described severe social phobia and claimed he had not been out of his house for two months. *Id* at 644. Dr. Sobotka diagnosed major depression, social phobia, and alcohol abuse, and began McGinley on anti-depressant medication. *Id* at 645. McGinley received great benefit from medication and when he was released from jail, his depression was "well controlled" with improved affect and motivation. *Id* at 641, 643.

In September 2002, Dr. Sobotka performed a psychiatric evaluation at Benton County Mental Health Services where McGinley continued treatment after his release. *Id* at 280-81.

McGinley denied any problematic drug or alcohol history, although his chart indicated he had used methamphetamine in the past. *Id* at 280. Dr. Sobotka concluded that his methamphetamine abuse was in remission and that his depression remained under control with medication. *Id*.

On September 27, 2002, McGinley was arrested for burglary, assault, menacing, and related crimes in an episode involving severe alcohol intoxication. *Id* at 58-86, 578. He again improved quickly with prescription medications and admitted that he needed alcohol treatment. *Id* at 575, 636, 640. He remained incarcerated for approximately 16 months during which he reportedly adhered to medication therapy and participated in anger management counseling. *Id* at 570.

After his release from prison, McGinley did not continue regular mental health treatment. He dropped in at Benton County Mental Health Services to restart medication for increasing depression in October and November 2004, and in March and April 2005. *Id* at 564, 567, 569, 570, 574. In May 2005, on the day he was scheduled to report to jail for reasons that are unclear, McGinley made a suicidal gesture by overdosing on his anti-depressant medication, ibuprofen, and a hypertension medication. *Id* at 559-61, 600-01. His mother reported that she had tried to be supportive, but "he can't stay away from drugs." *Id* at 561.

In June 2005, McGinley admitted a much more extensive substance abuse history than he had reported earlier. *Id* at 556-58. He admitted drinking on the weekends from age 18 until he reached age 30 in 1997, and drank daily for the next five years until he entered prison in late 2002. *Id* at 556. He also smoked methamphetamine regularly from age 22, including daily use from age 30. *Id*. He reported only drinking a couple of beers after his release from prison, but admitted using methamphetamine on a weekly basis beginning in March 2005. *Id*.

McGinley participated in group counseling and reported a "clean and sober" date of June 14, 2005. *Id* at 539-53. His mood was good and he reported working during this period. In October 2006, McGinley relapsed with methamphetamine binges and was referred for mental health treatment by his supervising officer. *Id* at 515-21. He was off anti-depressant medications and experiencing symptoms of depression. *Id* at 515. His intake diagnosis was methamphetamine dependence. *Id* at 520. At that time, McGinley reported that he had earned a GED, but had trouble with math. *Id* at 515.

In March 2007, McGinley again was discharged from treatment for failure to attend scheduled therapy sessions. *Id* at 483. He had provided three urinalysis samples of which two were positive for methamphetamine and opiates. *Id*.

In May 2007, he was back in jail for a violation of conditions of supervised release. *Id* at 479. He was not taking medications and reported suicidal ideation and depression. *Id*.

Dr. Sobotka saw McGinley for the first time since February 2003, at the Benton County Correctional Facility on July 3, 2007. *Id* at 631. McGinley reported he had been off his medications for months. *Id*. Dr. Sobotka started a new prescription and McGinley again did well. On July 17, 2007, McGinley had been off his medications for four days and was suffering typical symptoms of withdrawal from anti-depressants. *Id* at 628. He admitted recent methamphetamine use and was facing a new criminal charge for possession. *Id*.

On September 27, 2007, Dr. Sobotka provided a worksheet on which he checked boxes to indicate the severity of McGinley's limitations in 20 categories of mental function. *Id* at 473-76. The worksheet indicated limitations that would preclude work in several categories. Dr. Sobotka noted that he saw McGinley for two visits in September 2002 and again in jail for two visits in

July 2007. *Id* at 476. He opined that McGinley suffers from "recurrent major depression and

has associated anxiety" and "can become depressed but responds to medication. He would have

mood problems even without any history of methamphetamine abuse." *Id*.

The ALJ gave Dr. Sobotka's opinion "little weight." *Id* at 346. McGinley argues she did

not provide sufficient reasoning for discounting it. An ALJ can reject the uncontradicted opinion

of a treating physician for clear and convincing reasons. If contradicted by another doctor, then

the opinion can be rejected for specific and legitimate reasons that are supported by substantial

evidence in the record. *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002); *Lester v.

Chater*, 81 F3d 821, 830-31 (9th Cir 1995); *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir

1989).

The ALJ discounted Dr. Sobotka's opinion because his worksheet was unsupported by

clinical findings or explanation for the specific limitations he indicated. Tr. 346. She

specifically noted that Dr. Sobotka's treatment record was limited to "brief visits, separated by

many years." *Id*.

Dr. Sobotka saw McGinley briefly in a holding cell in April 2002 while McGinley was

awaiting transfer. His clinical impression then was that McGinley was feigning psychotic

symptoms and behaved in a manner inconsistent with severe mental illness. *Id* at 280, 646-47.

Dr. Sobotka next saw McGinley when he was arrested in August 2002, and diagnosed major

depression, social phobia, and alcohol abuse. *Id* at 644-45. He prescribed Celexa and McGinley

showed great improvement within one week. *Id* at 280. In September 2002, Dr. Sobotka opined

McGinley's depression was "well controlled" on Celexa. *Id* at 641.

McGinley's sudden relapse of depression and anxiety in late September 2002 coincided with a relapse of substance abuse leading to his arrest for burglary, assault, and related charges. *Id* at 58-86, 279. Dr. Sobotka saw McGinley three times in October 2002 in relation to his relapse. McGinley improved again after medications were re-established. *Id* at 636, 640, 642. Dr. Sobotka saw McGinley for medication adjustments in December 2002, January 2003, and February 2003. *Id* at 634, 638, 639. He did not see McGinley again until July 3, 2007, when McGinley was back in jail, had been off medications for months, and reported depressive symptoms. He claimed he had been clean and sober except for two brief methamphetamine relapses since getting out of prison in 2004. *Id* at 630-31. Dr. Sobotka restarted his medications, but McGinley apparently discontinued them after 10 days and had another methamphetamine relapse and a criminal charge for possession. *Id* at 628. Dr. Sobotka did not see McGinley again before offering his opinion.

This record reflects that when McGinley adhered to prescribed treatment, he was able to work and participate in group therapy sessions and reported his mood was good. An ALJ can reject a medical opinion that is brief and conclusory in form and does not offer clinical or objective findings to support its conclusion. *Meanal v. Apfel*, 172 F3d 1111, 1117 (9th Cir 1999); *Magallanes*, 881 F2d at 751. The only support offered by Dr. Sobotka was a diagnosis of major depression with associated anxiety based, which he counterbalanced with the statement that McGinley's depression responded to medication. Thus, the ALJ could reasonably conclude that McGinley's residual depression and anxiety when adhering to prescribed treatment and abstaining from substance abuse would not support the limitations Dr. Sobotka indicated.

McGinley objects that the ALJ mistakenly believed Dr. Sobotka had seen him only four times, twice in 2002 and twice in 2007. He contends that Dr. Sobotka had the best longitudinal view of his condition. In fact, Dr. Sobotka himself believed he had seen McGinley only the four times mentioned. Tr. 476. The ALJ's reliance on Dr. Sobotka's mistaken belief does not help McGinley because the additional treatment visits do not include findings that support Dr. Sobotka's opinion or undermine the ALJ's reasons for discounting it. The treatment record still shows that McGinley feigned psychotic symptoms for secondary gain, his depression and related anxiety responded well to medications, and his recurrent mood problems coincided with substance abuse relapses and discontinuance of medications.

The ALJ also discounted Dr. Sobotka's opinion because he was not aware of the extent of McGinley's ongoing drug abuse or his elevated level of functioning when he maintained abstinence and adhered to prescribed therapy. *Id* at 346. Dr. Sobotka believed McGinley had a history of methamphetamine abuse that was largely in remission, with isolated brief relapses. In September 2002, McGinley reported that he no longer used drugs. *Id* at 280. In July 2007, McGinley told Dr. Sobotka he had been clean since leaving prison in 2004, except for two brief relapses. *Id* at 630. The record shows that McGinley used methamphetamine weekly for several months in 2005, his mother reported he was unable to stay away from drugs in May 2005, his parole officer reported he was engaging in methamphetamine binges in October 2006, he was discharged from treatment in March 2007 after providing multiple positive urinalysis samples, and in July 2007 he was facing a new charge for possession of methamphetamine. The ALJ could reasonably conclude that McGinley minimized his drug abuse in his reports to Dr. Sobotka

and infer that Dr. Sobotka based his opinion on inaccurate assumptions about McGinley's drug abuse.

During periods when McGinley abstained from drug abuse and adhered to treatment, he apparently functioned fairly well. There are no records of mental health treatment while he was incarcerated during 2003 and 2004, but he later reported that Celexa and anger management therapy had helped him a great deal. *Id* at 570. While adhering to prescribed medication and participating in group therapy, his mood was good and he was able to work. *Id* at 539-53. These periods of higher functioning took place in the four-year interim separating Dr. Sobotka's visits with McGinley in early 2003 and his later visits in July 2007.

In summary, the ALJ's reasoning for giving Dr. Sobotka's opinion little weight is clear and convincing and supported by inferences reasonably drawn from the record as a whole. Even if the evidence could reasonably be interpreted as McGinley claims it should have been, the court may not substitute a different view of the evidence for the Commissioner's interpretation where "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039. Under such circumstances, the Commissioner's interpretation must be affirmed. *Id.*

**B.    Mental Health Evaluations**

Before he sought treatment for mental impairments, the state disability services agency requested a psychiatric examination for evaluation of McGinley's disability claim. Gale Smolen, MD, performed the psychiatric evaluation in June 2001. Tr. 156-61. McGinley claimed he was educated to the fifth grade after flunking the fourth grade twice and would have been placed in special education classes if he had continued in school. *Id* at 156. He was on probation for a theft committed in 1997 and had prior convictions for assault, aggression, menacing, and

criminal trespassing. *Id* at 157. He claimed abstinence from drugs and alcohol for four or five

years after having substance abuse problems in the remote past. *Id* at 158. McGinley claimed

physical symptoms of nervousness when he had to be around people and symptoms of

depression including loss of desire to do activities he enjoyed in the past and sleep disturbance.

*Id*.

Dr. Smolen reported McGinley's cognition and abstraction appeared to be poor. *Id* at

158-59. Trailmaking tests predicted an organic brain syndrome. *Id* at 159. A vocabulary screen

for intelligence was of doubtful validity because McGinley made incorrect responses to the most

simple word definitions. Tr. 160. He also had a response profile on the MMPI consistent with

exaggeration of symptoms or distortion of his mental status. *Id*. Such a profile could represent a

cry for help, malingering, or, as Dr. Smolen suggested, limited comprehension. *Id.*

Dr. Smolen diagnosed a major depressive disorder, generalized anxiety disorder, and

borderline intellectual functioning or possible mild mental retardation. *Id*. Based on

McGinley's claim that he stopped working due to stress, Dr. Smolen opined that he met the

criteria for decompensation in work settings. *Id*. Dr. Smolen recommended counseling and

further intelligence testing. *Id* at 160.

In August 2001, Mark Wagener, PhD, followed up with an intellectual evaluation using a

clinical interview and administration of the Wechsler Adult Intelligence Scale. *Id* at 189-92.

McGinley complained of depressed mood, severe anxiety around strangers, and fear of leaving

his house. *Id* at 189. McGinley said he had gone to school until the fifth grade, the last two

years in special education. *Id*. He worked from age 15 in concrete construction for three years,

then for a building supply company for three years, and finally as a hotel guest services

representative, but quit when he became severely depressed in 1996. *Id* at 190. He was a

weekend drinker until he stopped using alcohol in 1995 and denied any history of street drug

use. *Id*. His driving license was suspended for an unpaid fine. *Id*.

On intelligence testing, McGinley scored in the bottom percentile, in the extremely low

range of intellectual functioning, with scores of 68 for Verbal IQ, 57 for Performance IQ, and 61

for Full Scale IQ. *Id* at 191. Dr. Wagener diagnosed major depression, social phobia, cognitive

disorder, and mild mental retardation. *Id*. He opined that McGinley's cognitive deficits would

complicate his recovery from depression and preclude normal employment during the next year.

*Id* at 192.

In June 2002, Douglas Smyth, PhD, performed a neuropsychological evaluation based on

an interview of McGinley, a battery of tests, and a review of Dr. Wagener's report. *Id* at 204-11.

McGinley complained of life-long depression with current symptoms, but was not participating

in anti-depressant therapy. *Id* at 205. He said he quit school in the fifth grade and never

obtained a GED. *Id* at 206. He last worked for three years at a hotel, but quit due to depression

and anxiety in public situations. *Id*. He admitted using marijuana in the past, stopped using

alcohol in 1992, and denied current use of drugs. *Id* at 207.

Dr. Smyth obtained generally benign findings on his mental status examination, except

that McGinley's ability to perform calculations was poor and he was unresponsive to questions

requiring him to verbalize abstractions. *Id* at 208. On formal testing, McGinley again scored in

the bottom percentile, in the extremely low range of intellectual functioning, with scores of 59

for Verbal IQ, 57 for Performance IQ, and 54 for Full Scale IQ. *Id* at 208-09. These scores

suggested a significant drop in intellectual function compared to Dr. Wagener's findings in

August 2001.  *Id* at 209.  McGinley scored lower on memory testing than his IQ scores predicted.  *Id*.  On Trailmaking tests, McGinley scored in a range consistent with the scores of brain-damaged individuals.  *Id*.  On other testing, McGinley's results suggested severe depression, severe anxiety, and moderate social phobia.  *Id*.  On the MMPI, McGinley produced an invalid profile consistent with the test scores of subjects who were exaggerating their distress.  *Id* at 210.  Dr. Smyth diagnosed major depression, social phobia, cognitive disorder, and mild mental retardation.  *Id*.  He indicated McGinley's depression and anxiety could be treated, but his low intellectual function could not be altered through therapy.  *Id* at 211.  He opined that McGinley was not capable of continuous gainful employment.  *Id.*

The ALJ discussed the reports and opinions of Drs. Smolen, Wagener, and Smyth in her initial 2005 decision and incorporated that discussion in her 2008 decision after remand.  *Id* at 344, 360-66.  McGinley contends the ALJ failed to give their opinions proper consideration and improperly rejected their conclusions that he has mild mental retardation and debilitating anxiety in public situations and is not capable of regular gainful employment.  An ALJ can reject an examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ gives specific, legitimate reasons that are based on substantial evidence in the record.  *Thomas*, 278 F3d at 957; *Lester*, 81 F3d at 830*; Magallanes*, 881 F2d at 751.  An uncontradicted opinion may be rejected only for clear and convincing reasons.  *Thomas*, 278 F3d at 956-57.

The ALJ discounted the examiners' opinions because they were misled by McGinley's false reporting, exaggeration of symptoms, and the effects of ongoing substance abuse of which they were not aware.  Tr. 366.  The record supports the inference that McGinley falsely reported

his intellectual ability was so limited that he was unable to complete grade school and required special education.  His reports elsewhere indicate he completed a high school education with difficulty only in math.  The ALJ could reasonably conclude McGinley's false presentation tainted the examiners' evaluation of his intellectual capacity and led them to misinterpret the repeatedly invalid MMPI results as reflecting low comprehension instead of malingering.  The record also supports the inference that McGinley falsely reported he did not drink or use street drugs.  His reports elsewhere indicate he was continuing to abuse alcohol and methamphetamine at the time the examinations were done.  The ALJ could reasonably conclude McGinley's false presentation led the examiners to confuse side effects of substance abuse and withdrawal for clinical depression and associated anxiety.

These conclusions are supported by the opinion of Robert Davis, PhD, who examined McGinley at the hearing and provided expert testimony.  Dr. Davis opined that the IQ scores obtained by Drs. Wagener and Smyth were not valid.  *Id* at 307.  This was supported by the invalid MMPI scores Drs. Wagener and Smyth obtained at the same time they tested McGinley's intelligence.  Dr. Davis also found McGinley's participation during the hearing and the ideas expressed and word selection in his written submissions reflected intellectual abilities considerably exceeding the IQ measurements obtained by Drs. Wagener and Smyth.  *Id* at 307-09.  The ALJ found additional support in the observations reported by law enforcement officers. The officers who arrested McGinley in September 2002 indicated that he engaged in an intelligent debate about whether his actions satisfied the elements of a burglary charge.  *Id* at 68, 258.  McGinley's parole officer stated that his observations and interactions with McGinley suggested he was of average intelligence.  *Id* at 257-58.  McGinley's former case supervisor

reported his observations and interactions with McGinley did not suggest any mental limitation that would impede employment. *Id* at 258.

Dr. Davis also testified that McGinley's substance abuse played a role in the depression and associated anxiety symptoms found by Drs. Smolen, Wagener, and Smyth. Dr. Davis indicated these symptoms are an inevitable consequence of methamphetamine dependence and withdrawal. *Id* at 310, 314. McGinley's later admission that he smoked methamphetamine daily beginning at age 30 and continuing through age 34, which he attained in March 2001, supports the conclusion that substance abuse was a factor in these examinations. *Id* at 556. It is further supported by McGinley's testimony that he continued to use methamphetamine in 2002. *Id* at 299-300. Drs. Smolen, Wagener, and Smyth were not aware of McGinley's ongoing substance abuse when they reached their conclusions because they relied on his false reports of abstinence from alcohol and street drugs. *Id* at 158, 190, 207.

The ALJ also relied on Dr. Davis's opinion that malingering stood out as a factor in these examinations. *Id* at 310, 320. He noted that the MMPI scores suggested McGinley was "faking bad on – in the extreme" on testing. *Id* at 322. Dr. Davis believed the diagnosis of malingering was consistent with other indications in the record that McGinley provided false reports when it was advantageous for him to do so. *Id.* The ALJ found additional support for the conclusion that malingering contributed to these examinations in the treatment records of sources who concluded McGinley lied about painful physical conditions to obtain narcotic pain medications. *Id* at 274-75, 364-65. There is no indication that Drs. Smolen, Wagener, and Smyth were aware of McGinley's general lack of credibility or history of making false medical reports for secondary gain when they issued their evaluation reports.

The ALJ also relied on the report of the Cooperative Disability Investigations Unit ("CDIU"), which investigated and reported on McGinley's level of functioning in the community  in November 2002.  *Id* at 256-64.  McGinley alleged he was paranoid, afraid to go outside of his mother's house, had no interest in public life, and never went out to visit friends or relatives.  *Id* at 111, 141, 146, 148.  When the CDIU investigator tried to contact McGinley at home, his mother reported that McGinley just leaves his clothing at her residence and is usually not there.  *Id* at 257.  McGinley's parole officer indicated McGinley was able to leave his mother's home and get around town and spent a lot of time with his girlfriend.  *Id* at 262. Drs. Smolen, Wagener and Smyth were not aware of these indications that McGinley overstated the extent of his isolation and anxiety in public when they issued their reports.

The ALJ also relied on the findings of the agency psychological experts who did not examine McGinley but who reviewed his entire case record and concluded it did not support severe psychological impairments other than substance abuse disorder.  *Id* at 219-49.  As in Dr. Davis's case, the reviewing psychologists had additional information from which they were able to form more accurate conclusions about McGinley's allegations than the examining sources.

In summary, the ALJ gave clear and convincing reasons for discounting the evaluations of Drs. Smolen, Wagener, and Smyth.  Their conclusions were predicated on assumptions that are not supported by the record.  They accepted McGinley's subjective reports which cannot be believed.  The ALJ may reject a physician's opinion which is "based primarily on discredited and subjective complaints."  *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001); *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989).  The ALJ could reasonably find that Dr. Davis and the

reviewing experts had greater information than the examining sources and reached more accurate conclusions regarding McGinley's mental impairments. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 602-03 (9th Cir 1999); *Andrews*, 53 F3d at 1043. The ALJ's reasoning is supported by inferences reasonably drawn from the record and is sustained.

**C.    Lay Witness Statements**

McGinley's mother, Anna McGinley, provided a written questionnaire regarding his activities and socialization. Tr. 127-38. She indicated that McGinley gets along well and has appropriate and normal conversations with family members and friends, but gets frustrated and wants to argue a lot. He seldom leaves home, but goes to the store once or twice a week and visits family and friends. He does not go out for social activities or participate in organized activities or clubs. He socializes with others sometimes, but seems to want to be alone, has few friends, and seldom has visitors. He has problems relating to health care providers. He does not attend athletic events, but plays cards, watches the news and sports activities on television and can remember and discuss what he has watched. He can read, write, remember and discuss what he reads, and needs no reminder to take his medications.

In her assessment of McGinley's RFC, the ALJ found he could perform work involving simple, routine tasks, which did not require extended periods of concentration, close work with co-workers, teamwork, or interaction with the general public. *Id* at 348. The ALJ found Anna McGinley's comments on the questionnaire generally consistent with this RFC assessment. *Id* at 346.

McGinley argues the ALJ failed to provide adequate reasons for rejecting Anna McGinley's questionnaire. He points out that the questionnaire indicates he has a very limited

social life, is argumentative with friends and family, and has difficulty relating to health care providers. The ALJ reasonably accommodated those limitations by precluding close work with co-workers, teamwork, and interactions with the general public from McGinley's RFC assessment. McGinley does not identify additional functional limitations in work-related activities supported by the questionnaire which the ALJ should have included in the RFC. Accordingly, even if Anna McGinley's questionnaire responses were credited entirely, they would not establish any functional limitations in excess of those in the RFC assessment.

The ALJ also discounted the weight of Anna McGinley's statements because they were brief, incomplete, and conclusory, because the CDIU report suggested he engaged in some social and public activities, and because McGinley limited his social activities due to lack of money. *Id* at 346. The ALJ's reasoning is at least partially erroneous because the record contains no evidence that lack of money limited McGinley's social activities. However, this error is harmless because accepting everything in the questionnaire does not establish functional limitations in excess of the ALJ's RFC assessment.

## II. **Vocational Evidence**

McGinley contends the ALJ failed to satisfy the Commissioner's burden at step five of the decision-making process. At step five, the Commissioner must show there are jobs in the national economy that the claimant can do. *Tackett v. Apfel,* 180 F3d 1094, 1099 (9th Cir 1999). The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant. *Id*; *Andrews*, 53 F3d at 1043.

Here, the ALJ elicited testimony from the VE based on the ALJ's RFC assessment. Tr. 349-50, 679-82. McGinley contends the ALJ's RFC assessment and vocational assumptions

19 - OPINION AND ORDER

are inaccurate because they do not include the limitations identified by Drs. Sobotka, Wagener, and Smyth. Those challenges to the ALJ's RFC assessment cannot be sustained for the reasons previously discussed. The ALJ was not required to incorporate additional limitations she found not supported by the record. *Osenbrock v. Apfel,* 240 F3d 1157, 1163-65 (9th Cir 2001); *Magallanes*, 881 F2d at 756-57. The ALJ properly relied on the VE's testimony because it was elicited with a hypothetical question which "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record." *Bayliss v. Barnhart,* 427 F3d 1211, 1217 (9th Cir 2005).

The VE testified that a person with the RFC described by the ALJ could perform the work activities required in occupations such as small products assembler, motel cleaner, and industrial cleaner, which represent thousands of jobs in the national economy. Tr. 349-50, 679-82. Accordingly, McGinley's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## **ORDER**

For the foregoing reasons, the ALJ's decision is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED.

DATED this 2nd day of July, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge